IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

APRILLE VANICK,
    Plaintiff,

vs.                                  Case No.: 5:11cv184/RH/EMT

MICHAEL J. ASTRUE,
Commissioner of the Social Security Administration,
    Defendant.
_____/

**REPORT AND RECOMMENDATION**

      This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court pertaining to review of administrative determinations under the Social Security Act ("the Act") and related statutes, 42 U.S.C. § 401, *et seq*. It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for Supplemental Security Income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

      Upon review of the record, the court concludes that certain determinations of the Commissioner are not supported by substantial evidence; thus, the court recommends that the decision of the Commissioner be reversed and remanded for further proceedings.

I.      PROCEDURAL HISTORY

      On April 11, 2007, Plaintiff filed an application for SSI, alleging disability beginning January 1, 1995 (Tr. 128).[1] Her application was denied initially and on reconsideration. Plaintiff requested

---

[1] All references to "Tr." refer to the transcript of Social Security Administration record filed on September 16, 2011 (Doc. 10). Additionally, the page numbers refer to those found on the lower right-hand corner of each page of the transcript rather than those assigned by the court's electronic docketing system or any other page numbers that may appear.

a hearing before an administrative law judge ("ALJ"), who held a hearing on February 3, 2010, at which Plaintiff and a vocational expert ("VE") testified.  At the hearing Plaintiff amended her disability onset date to April 11, 2007, the date she filed her SSI application.  On March 26, 2010, the ALJ issued a decision in which he found Plaintiff was "not disabled," as defined under the Act, at any time through the date of his decision (Tr. 13–24).  The Appeals Council denied Plaintiff's request for review on April 7, 2011 (Tr. 1), making the ALJ's decision the final decision of the Commissioner.  *See* Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007).  This appeal timely followed.

II.   FINDINGS OF THE ALJ

In his March 26, 2010, decision, the ALJ made the following findings:

1)   Plaintiff has not engaged in substantial gainful activity since April 11, 2007, the date she filed her SSI application.

2)   Plaintiff has the following severe impairments: degenerative disc disease and mild mood/anxiety disorder due to physical impairments.

3)   Plaintiff does not have an impairment or combination of impairments that meets or medically equals a listed impairment.

4)   Plaintiff has the residual functional capacity ("RFC") to perform light work,[2] except she may lift and/or carry twenty pounds occasionally and lift and/or carry ten pounds frequently.  Plaintiff may stand and/or walk for six hours total in an eight-hour workday.  Plaintiff may sit a total of six hours total in an eight-hour workday.  Plaintiff is unlimited in her push/pull activities.  Plaintiff may occasionally climb ramps/stairs, balance, stoop, kneel, crouch, crawl, and reach, but she should never climb ladders, ropes, or scaffolds.  Plaintiff is able to understand, remember, and

---

[2]  Light work is defined in § 416.967(b) as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 416.1567(b).

        carry out simple instructions and she is able to concentrate and persist for two-hour segments.

5)     Plaintiff has no past relevant work.

6)     Plaintiff was born on April 26, 1967, making her thirty-nine years of age on the date she filed her SSI application. At age thirty-nine, Plaintiff was a younger individual as defined in the Regulations.

7)     Plaintiff has a limited education and is able to communicate in English.

8)     Transferability of jobs skills is not an issue because Plaintiff does not have past relevant work.

9)     Based on Plaintiff's age, education, work experience, and RFC, and the testimony of the VE, jobs exist in significant numbers in the national economy that Plaintiff can perform.

10)    Plaintiff has not been under a disability, as defined in the Act, since April 11, 2007, the date she filed her SSI application.

III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not

a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her/his previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, she is not disabled.

2. If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3. If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4. If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5. Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV. PLAINTIFF'S MEDICAL HISTORY[3]

The records of the following five physicians reflect treatment prior to Plaintiff's alleged disability onset date in April 2007. Urologist Neal P. Dunn, M.D ("Dr. Dunn"), or other health care professionals in his office, treated Plaintiff from December 1997 through approximately September 2005 for various urinary complaints, including urethral stenosis, microhematuria, and nephrolithiasis (Tr. 206–19). James Pappas, M.D. ("Dr. Pappas"), treated Plaintiff from August 2005 to June 2006, primarily for breast problems; his clinical notes and several attached surgical reports also reference removal of a cyst and fatty tumor, obesity, hypertension, cervical disc disease, headaches, and

---

[3] The information set forth in this Medical History is based partly on the facts set forth in the opinion of ALJ, whose facts the Commissioner adopts in his memorandum, and partly from those presented in Plaintiff's memorandum. With respect to Plaintiff's memorandum, the court notes its poor compliance with the September 21, 2011, Scheduling Order (Doc. 11). In that Order, the court gave the parties clearly defined instructions regarding the filing of memoranda in support of their respective positions. With respect to Plaintiff, the court directed her counsel to file a memorandum that set forth Plaintiff's legal contentions and "specifically cite[d] the record by page number for factual contentions." (Id. at 1, emphasis in original). The court further instructed that the "[f]ailure . . . to support factual contentions with accurate, precise citations to the record will result in the contention(s) being disregarded for lack of proper development." (Id. at 2, emphasis in original). These instructions notwithstanding, in the Relevant Medical Evidence and Argument sections of her memoranda Plaintiff only cites the administrative file by specific page number with respect to certain factual contentions. In some instances there are no page number references at all (see, e.g., Doc. 14 at 3, referencing records of Neal P. Dunn, M.D, and id. at 6–7, referencing records of Douglas Stringer, M.D.), and in numerous others there is only a general reference to sections of the administrative file (see id. at 3, 4, 5, and 7; 10–11). So as not to prejudice Plaintiff, the court has considered all of her counsel's factual contentions. Counsel should be aware, however, that the failure to comply with the court's instructions in its Scheduling Orders can result in the court's disregarding factual contentions for lack of proper development.

Case No.: 5:11cv184/RH/EMT

dizziness ( Tr. 220–34). From January 2006 to December 2006 Misal Khan, M.D., saw Plaintiff (Tr. 294–305). Many of Dr. Khan's records are illegible, but it appears his care largely involved the management of Plaintiff's pain, blood pressure, and other medications or treatment of such transitory problems as arm pain, cough, stomach problems, and teeth problems. In March 2006 Mustafa Hammad, M.D. ("Dr. Hammad"), diagnosed Plaintiff with chronic neck myofascial pain with trigger points, cervical radiculopathy, cervical disc disease, restless leg syndrome, hypertension, and gastroesophageal reflux disease (Tr. 276). In May 2006 Firas Saleh, M.D. ("Dr. Saleh"), another physician in Dr. Hammad's practice, saw Plaintiff. Dr. Saleh diagnosed occipital neuralgia, anxiety, depression, neck pain, cervical radiculopathy, restless leg syndrome, insomnia, probable obstructive sleep apnea hypopnea syndrome, hypertension, and gastroesophageal reflux disease (Tr. 264).

In March 2007, or approximately one month prior to Plaintiff's alleged disability onset date, Samir Yassin, M.D. ("Dr. Yassin"), examined Plaintiff and assessed hypertension, depression, and headaches; his plan included prescribing medication for Plaintiff's hypertension, Motrin for pain, and Welbutrin for depression/anxiety (Tr. 358). Also in March 2007, magnetic resonance imaging ("MRI") of Plaintiff's lumbar spine showed disc degeneration at L4-5 and L5-S1 with early changes at L3-4 (Tr. 313). There was also a midline disc bulge at L5-S1 and, to a lesser degree, at L4-5 and questionably at L3-4 (*id.*). A March 2007 MRI of the cervical spine showed early disc degeneration throughout but no focal disc abnormality was identified (Tr. 314).

Aaron J. Shores, M.D. ("Dr. Shores"), saw Plaintiff in April 2007, when Plaintiff complained of constant, aching, stabbing, and burning back and neck pain that increased with most movements and decreased with pain medication (Tr. 306). She reported that her baseline pain was 7 out of 10, on a 10-point scale (10 being the highest level of pain), with a current pain level of 10 (*id.*). According to Plaintiff, she had been on a regimen of Lortab and Soma for several years, as well as Ultracet, Darvocet, and nonsteroidal anti-inflammatory drugs with no effect on her pain (*id.* at 305). A physical examination was unremarkable. Dr. Shores assessed Plaintiff with probable fibromyalgia but he refused to accept her as a patient for future care. According to Dr. Shores, two other medical practices had fired Plaintiff because she had obtained narcotics from several different physicians simultaneously. In light of inconsistencies between her explanation of those events and the version

provided by the physicians' offices which had discharged her, Dr. Shores did not feel comfortable entering into a treating relationship with Plaintiff (*id.* at 307).

Dr. Yassin saw Plaintiff again in May 2007 for left foot pain, diverticulitis, back pain, and anxiety (Tr. 357). The following day, podiatrist Jala K. Sidani, D.P.M. ("Dr. Sidani"), diagnosed a fractured metatarsal bone in Plaintiff's left foot (Tr. 353). In August 2007 Plaintiff presented to an emergency room complaining of back pain. The examining physician, John Langley, M.D. ("Dr. Langley"), diagnosed acute back pain, headache, a history of fever, and status post epidural steroid injections (Tr. 346). He found significant infection at the site of the epidural injection but no swelling, induration, or warmth. Dr. Langley considered the possibility that Plaintiff's "presentation was psychogenic or functional as the patient is newly out of her Percocet." (*Id.*). He discharged her with a small prescription for Percocet and, noting Plaintiff's extensive medical history, commented that Plaintiff "seems to be chronically ill at such a young age" (*id.*). She was advised to follow up with her regular physician (*id.*). Plaintiff presented to Dr. Yassin a few days later, when he noted her complaints of headache, vomiting, fever, numbness and tingling, lower back pain, and diarrhea following a recent epidural steroid injection (Tr. 355). He ordered a lumber MRI to check for spinal fluid leakage (*id.*). The MRI was unremarkable at L1-2, L2-3, L3-4, and L4-5 (Tr. 354). The L5-S1 level showed a small left paracentral disc protrusion, with no canal stenosis or foraminal narrowing (*id.*).

David A. Loiry, Ph.D. ("Dr. Loiry"), saw Plaintiff in October 2007 for a consultative mental evaluation (Tr. 365–66). Dr. Loiry noted that Plaintiff reported suffering from severe pain on a daily basis that caused her to be depressed and anxious. She also reported that she had five bulging discs in her lower back as well as nerve damage and had been diagnosed with osteoporosis of the spine (Tr. 365). According to Plaintiff, she had a violent reaction to a steroid injection in her back by a physician recommended by Dr. Yassin; following that incident, Dr. Yassin refused to see her any longer, "which she thinks might be because Dr. Yassin was afraid she would sue him." (*Id.*). Plaintiff also told Dr. Loiry that she had been previously diagnosed with post-traumatic stress disorder caused by the death of her child but she reported that she not received any treatment for this condition. Dr. Loiry noted that Plaintiff's mood was depressed, but her insight and judgment were

adequate.  She denied hallucinations and delusions but admitted suicidal ideation recently with no plan.  Plaintiff was oriented to time and place.  Dr. Loiry found Plaintiff's instantaneous memory to be good although her recall was poor; Plaintiff reported her remote memory was excellent but her concentration was "'horrible'" (Tr. 366).  Plaintiff's ability to recite serial 3s was satisfactory.  Dr. Loiry estimated Plaintiff's intelligence to be above average but her fund of information was not very good.  His diagnoses included mood disorder and anxiety disorder due to multiple physical impairments.  Plaintiff's prognosis, according to Dr. Loiry, was "[n]ot good, considering the multiplicity and intensity of her impairments" (*id.*).

Huan Vu, M.D. ("Dr. Vu"), noted in an emergency hospital report from August 2008 that Plaintiff repeatedly complained of a pain level of 10 though he observed her sitting upright and looking comfortable (Tr. 483).  Dr. Vu reported that Plaintiff's physical examination was completely benign, and he could not find any clear etiology of her reported pain; he noted that Plaintiff's colon was full of stool and Plaintiff complained of constipation.  Plaintiff wanted to be discharged with narcotic pain medication, but Dr. Vu advised that narcotics would constipate her further.  Dr. Vu advised Plaintiff to take over-the-counter Tylenol as needed for her pain, but she became unhappy and "left the emergency department very upset and vocal about the fact that she could not get any narcotic pain medication." (*Id.*).  Dr. Vu opined that Plaintiff was "exhibiting obvious drug seeking behavior here given her complaints of having severe 10/10 pain without any obvious source and unremarkable work up in conjunction with alleged allergies to all pain medication except narcotics." (*Id.*).

The treatment records of Douglas L. Stringer, M.D. ("Dr. Douglas Stringer") and Merle  P. Stringer, M.D., ("Dr. Merle Stringer") commence in October 2008 (*see* Tr. 393–452).  In November 2008 Dr. Merle Stringer noted that after recently undergoing injections Plaintiff showed significant improvement in her facet and sacroiliac pain though she continued to complain of muscle spasms and trigger point tenderness (Tr. at 447).  Dr. Merle Stringer's impressions and differential diagnoses included lumbar disc disease with low back pain but no evidence of nerve root compression; lumbar facet and sacroiliac pain, with improvement in pain from a 10 to a 2–3; and continuing trigger point tenderness and muscle spasm.  A December 2008 report by Dr. Douglas Stringer reflects that

Plaintiff had an MRI of the lumbar spine in September 2008 (Tr. 435). The MRI showed Plaintiff had L4-L5 facet hypertrophy, bulging disc eccentric to the left with nerve root compression on the left with narrowing of the lateral recess on the left; facet hypertrophy at L4-L5 and L5-S1; and L5-S1 broad based bulging disc narrowing of the lateral recess on the left with nerve root compression on the left. Dr. Douglas Stringer's impression and differential diagnoses were 1) lumbar disc disease, low back pain, left leg pain with clinical and radiological evidence of nerve root compression at L4-L5 and L5-S1 on the left; and 2) severe mechanical back pain which was much worse with activity and better with rest. Dr. Douglas Stringer recommended surgical intervention and medication, noting there was no evidence of drug addiction or abuse (*id.*). In January 2009 Dr. Douglas Stringer performed a hemilaminotomy at L4-L5 on the left, decompression of nerve roots, foraminotomy of the nerve roots; microdiskectomy at L4-L5 on the left; laminotomy at L5-S1 on the left, decompression of the nerve roots, foraminotomy of the nerve roots; posterolateral fusion at L4-L5 and L5-S1; and fluoroscopy (*id.* at 433). The next day, Plaintiff presented to the emergency room, where Riyad Albibi, M.D., treated her for constipation (Tr. 471–72).

   At an April 2009 visit, Dr. Merle Stringer noted that Plaintiff had recently undergone an MRI of the lumbar spine which showed postoperative changes but no significant nerve root compression or spinal stenosis (Tr. 414). He noted that Plaintiff had injured her back recently, resulting in low back and left leg pain which was suspicious for lumbar nerve root irritation (*id.*). In a follow-up note from May 2009, Dr. Douglas Stringer reported that Plaintiff was doing well with complete relief of radicular pain and minimal residual low back pain (Tr. 411). Plaintiff was walking more, with less pain, and she had returned to most of her usual activities; she had experienced dramatic improvement with pain after her surgery though increased activity resulted in increased pain (Tr. 413). In June 2009 Dr. Douglas Stringer that Plaintiff was "much better." (Tr. 407). He decreased her Lortab medication and noted that Plaintiff was to continue with her exercise and weight reduction program (*id.*). In July 2009 Dr. Douglas Stringer saw Plaintiff for complaints of leg pain, paresthesias, and increased back pain after she attempted to lift a washing machine (Tr. 404). He advised an MRI (Tr. 402). Plaintiff returned in October 2009, when Dr. Merle Stringer noted that Plaintiff had not had the recommended MRI due to a reported lack of insurance coverage; he again advised Plaintiff to

undergo an MRI (Tr. 399). His impression was lumbar disc disease, low back and bilateral leg pain, which was suspicious for lumbar nerve root irritation (*id.*). He also noted sacroiliac joint tenderness; bilateral lumbar facet irritation at L3-4, L4-5, and L5-S1; and areas of localized tenderness involving the lumbar paravertebral muscles bilaterally (*id.*).

In a November 2009 clinical note, Dr. Douglas Stringer reported that Plaintiff had experienced complete relief of pain following her January 2009 surgery "until the last few weeks when she was overdoing it at home" and suffered recurrent symptoms (Tr. 398). Dr. Stringer's impressions included lumbar disc disease, low back pain, no definite nerve root compression; increased difficulty after doing heavy work at home; lumbar facet pain worse at L3-L4, L4-L5 and L5-S1, worse on the left; and left sacroiliac joint pain with muscle spasm and trigger point tenderness. He also noted that Plaintiff had been doing well after surgery until being injured lifting a heavy appliance and increasing her activity at home (Tr. 396). In November 2009 Dr. Douglas Stringer performed a diagnostic facet block and fluoroscopy (Tr. 394), noting that after the procedure analgesic relief was not good. He recommended medication and injections (Tr. 395). An entry from December 2009 notes that Plaintiff failed to appear for an injection appointment (Tr. 393). Following the date of this entry there are no additional records of care from Dr. Douglas Stringer or Dr. Merle Stringer.

V.    PLAINTIFF'S HEARING TESTIMONY

Upon direct examination by the ALJ, Plaintiff testified that she was 5'3" tall and weighed 238 pounds (Tr. 39). She last worked in 2005 at a restaurant shucking oysters, for about one week (Tr. 41–42). According to Plaintiff, at one time she had tried to get into the housecleaning business but could not due to pain (Tr. 43). Plaintiff testified that she did not cook much at home but could prepare microwaveable meals (Tr. 45). She could manage her personal hygiene needs but did little housework and no yard work (Tr. 44–48). On a typical day she would take a bath, get out food for her children to eat, and then go back to bed and watch television until about 4:00 p.m.; she enjoyed watching movies and following crime and other programs and she also spent about an hour a day reading (Tr. 49, 51). In the past year she had taken a two-day, twelve-hour automobile trip as a passenger to Missouri to attend a funeral (Tr. 47). Plaintiff's driver's license expired in 1998 and

she currently relied on others for transportation (Tr. 39, 58). Plaintiff did not take any medications because she could not see any doctors (Tr. 51). According to Plaintiff, her Medicaid insurance coverage had been dropped and she could not afford a primary care doctor (Tr. 41). Plaintiff last took prescribed medications, Lortab and Skelaxin, in December of 2009 (*id.*). She reported having had intermittent access to pain medication in recent years, estimating that between 2007 and 2010 she had been prescribed pain medications on twelve occasions for approximately one month each time (Tr. 54). Plaintiff acknowledged that she had overmedicated herself by accepting pain prescriptions from two physicians simultaneously but maintained that at the time she did not understand that she was doing anything wrong (Tr. 55). Plaintiff also acknowledged that she failed to attend several consultative examinations scheduled by the Division of Disability Determinations (Tr. 58).

Plaintiff testified that she could not work due to pain in her back, legs, neck, and hands; arthritis in both hands; and lack of concentration (Tr. 51–52). According to Plaintiff, on a pain scale of one to ten, her pain was at ten constantly (Tr. 53). Medications would reduce her level of pain to about a six or seven (*id.*). She also suffered from anxiety, post-traumatic stress disorder, panic attacks, depression, and crying spells (Tr. 57). According to Plaintiff, she has not received any therapy for her depression (Tr. 60).

VI.     ISSUES PRESENTED[4]

Plaintiff asserts the ALJ erred by 1) failing to review and evaluate the medical records of all of her treating physicians, including "but not limited to" Dr. Dunn, Dr. Khan, Dr. Pappas, and Dr. Yassin; and 2) making the internally inconsistent step two finding that she had the "severe" impairment of "mild" mood/anxiety disorder (*see* Doc. 14 at 9–11). Submitting "there is ample evidence to conclude that she is disabled," Plaintiff requests an outright award of benefits;

---

[4] The court notes that, as is the practice in this district, it directed the Commissioner to file a response or memorandum in response to Plaintiff's memorandum in support of her complaint (Doc. 11). Instead, the Commissioner filed a motion for summary judgment (Doc. 17), to which Plaintiff then filed a response (Doc. 18). Subsequently, the court advised the parties it would construe the motion for summary judgment as a memorandum in opposition to Plaintiff's memorandum and Plaintiff's response to such motion as a reply to the Commissioner's memorandum (Doc. 19). For future reference, the court reminds the Commissioner that—absent receiving prior leave of court—he should file a response or memorandum in opposition to a Social Security plaintiff's memorandum in support of her complaint as directed by the court, *not* a motion for summary judgment.

Case No.: 5:11cv184/RH/EMT

alternatively, she seeks remand with instructions to properly evaluate the medical evidence of record from her treating physicians and to determine whether "Plaintiff's mood/anxiety disorder is a 'severe' impairment producing more than minimal limitations" (*id.* at 11).

With respect to the first of Plaintiff's contentions, the Commissioner responds that the ALJ properly reviewed the administrative record as a whole and was not required to discuss every single piece of evidence it contains. Moreover, the records of Drs. Dunn, Khan, and Pappas predate the April 2007 disability onset date; also, while Dr. Yassin treated Plaintiff on several occasions he eventually refused to treat her. Finally, the Commissioner argues, Plaintiff has failed to identify anything in the records of these physicians that disputes the ALJ's findings (Doc. 17 at 9). As to Plaintiff's second contention, the Commissioner notes that because the ALJ found Plaintiff had a moderate limitation in maintaining concentration, persistence, or pace it was appropriate under the Regulations to conclude she had a "severe" impairment. In any event, there is no opinion in the record that Plaintiff's mental impairment imposes greater limitations on her ability to work than the restrictions the ALJ identified, that is, that Plaintiff could understand, remember, and carry out simple instructions and could concentrate and persist for two hour segments (*id.* at 11).

In her lengthy reply, Plaintiff asserts, *inter alia*, that in developing a full and fair record the ALJ must discuss "every piece of medical evidence along with all relevant evidence." (Doc. 18 at 3) (emphasis omitted). Here, Plaintiff contends, the medical records and opinions of the treating physicians at issue are directly relevant to her claim of disability; moreover, they should properly cover the period prior to her April 2007 alleged onset date, so as to take into account how the combination of impairments might work together to become disabling and to fairly evaluate her credibility[5] (*id.* at 5). Plaintiff also challenges the Commissioner's reference to her failure to seek

---

[5] The ALJ discounted Plaintiff's credibility because he found her testimony to be inconsistent in several respects (*see* Tr. 18). The inconsistencies include her statements that she lacked the ability to concentrate due to pain but nevertheless was able to watch television for most of the day, including dramatic programs, and to read for one-hour periods of time. The ALJ also questioned Plaintiff's testimony that her pain level constantly was a 10; when asked if she needed to go to the emergency room for this severe pain, Plaintiff replied that she had learned to tolerate it and that her pain was different from other people's pain. The ALJ also found Plaintiff's testimony that she suffered from such severe pain to be inconsistent with her statement that she had not been on any pain medication since December of 2009. Additionally, the ALJ noted that although Plaintiff testified that she suffered from depression and anxiety, she also stated had not received or sought mental health treatment. Finally, the ALJ concluded that Plaintiff was able to do a wide variety of activities of daily living which suggested her impairments were not as severe as she alleged.

Case No.: 5:11cv184/RH/EMT

medical help, stating that the Commissioner failed to address evidence of record suggesting that due to her financial situation Plaintiff had been unable to obtain medical attention and, currently, to take pain medication (*id.*). Plaintiff also submits that the Commissioner's evaluation of Plaintiff's mental impairment is unclear, because for an impairment to be classified as severe at step two it must significantly limit a person's physical or mental ability to do basic work activities yet the ALJ found that Plaintiff's mood/anxiety disorder produced no restriction in her daily living activities and only mild difficulty with social functioning. In short, Plaintiff contends, the ALJ failed to develop a full and fair record by disregarding the records of several treating physicians and by failing to clearly state the severity and limitations of her mental impairment. She again asks the court to remand the case with instructions to properly evaluate the records of all of her treating physicians and to properly determine the severity of her mental impairments.

VII.   DISCUSSION

The court first addresses Plaintiff's argument that the ALJ did not properly consider her mental impairment, which she contends constitutes error at step two of the sequential analysis. With the observation that the ALJ's step two mental impairment determination actually was *favorable* to Plaintiff, the court notes the following. At step two of the sequential evaluation process, the claimant must prove that she is suffering from a severe impairment or combination of impairments, that has lasted (or must be expected to last) for a continuous period of at least twelve months, and which significantly limits her physical or mental ability to perform "basic work activities." *See* 20 C.F.R. §§ 416.909, 416.920(c), 416.921(a). Basic work activities include mental functions such as understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting (as well as physical functions not at issue here). 20 C.F.R. § 416.921(b). The regulations mandate specific procedures for evaluating mental impairments, *see* 20 C.F.R. § 416.920a and 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00 *et seq.,* including the evaluation of two sets of criteria known as the "Paragraph A" and "Paragraph B" criteria. Paragraph A criteria relate to medical findings. Paragraph B criteria address impairment-related functional limitations in four

broad areas: activities of daily living; social functioning; concentration, persistence or pace; and repeated episodes of decompensation (*see, e.g.*, Listing 12.00C). Generally, a mental impairment is deemed non-severe at step two if the degree of limitation in the first three functional areas is "none" or "mild," and the degree of limitation in the fourth area is "none," "unless the evidence otherwise indicates that there is more than a minimal limitation in [a claimant's] ability to do basic work activities." 20 C.F.R. § 416.920a(d)(1).

Here, addressing the Paragraph B criteria, the ALJ concluded that Plaintiff had no restrictions in activities of daily living, only mild difficulties in social functioning, and no episodes of decompensation (Tr. 16–17). He additionally found that Plaintiff experienced moderate difficulties with respect to concentration, persistence, or pace (Tr. 16). Based on these findings, the ALJ concluded at step two that Plaintiff suffered from a mild mood/anxiety disorder, a mental impairment that should be rated "severe" at step two of the sequential analysis (Tr. 15, 17).

First, the ALJ's decision reflects that he adequately followed the procedures set out in the Regulations for evaluating mental disorders by considering the four broad functional areas identified in Paragraph B (Tr. 16–17). Second, the ALJ's determination is supported by substantial evidence. The record reflects that Plaintiff is able to care for her personal needs, prepare simple meals, and shop with assistance (Tr. 16; Tr. 169, Report of Contact dated June 13, 2007; and Tr. 379, Psychiatric Review Technique completed by state disability expert Judith E. Meyers, Psy.D.). Additionally, although Plaintiff's driver's license has expired, the fact that she does not drive is attributable to her physical rather than mental condition (Tr. 16; Tr. 169). Thus, there is evidence which supports the ALJ's finding that Plaintiff's activities of daily living are not restricted. The ALJ's determination that Plaintiff has only mild restrictions in the area of social functioning (Tr. 16) is also supported by the record. As the ALJ noted, although Plaintiff told Dr. Loiry in October 2007 that she could not function socially due to her severe anxiety, she also reported that she had friends who drove for her and that she got along fairly well with others (*id.;* Tr. 168, Report of Contact dated June 11, 2007; Tr. 379). The record also reflects no episodes of decompensation of extended duration, which supports the ALJ's finding in this regard. As to Plaintiff's ability to maintain concentration, persistence, or pace, Dr. Loiry apparently accepted Plaintiff's report that she was unable to complete

tasks in a timely manner.  Nevertheless, although Plaintiff described her concentration as "horrible," she reported to Dr. Loiry that her overall memory was good most of the time and he noted that she could complete serial 3s.  Also, Plaintiff testified that she was able to watch and follow numerous types of television programs, including somewhat complex crime dramas.  Based on the totality of the evidence pertaining to concentration, persistence, or pace, the ALJ concluded that Plaintiff had moderate difficulties in this domain, a determination that is adequately supported by the evidence just cited.

In sum, the court discerns no error in the ALJ's step two "severity" finding that Plaintiff suffers from a "mild" mood/anxiety disorder.  Given that the degree of limitation in the first, second, and fourth functional areas (activities of daily living, social functioning, and episodes of decompensation) was "none" or "mild," but "moderate" with respect to the third (concentration, persistence, or pace), the ALJ fairly described Plaintiff's mood/anxiety disorder overall as "mild" in nature.  Because Plaintiff's ability to maintain concentration, persistence, or pace was moderately limited, however, that is, it caused a more than a minimal limitation in her ability to perform basic work activities, the ALJ properly—and not inconsistently or unclearly—classified it at step two as a severe impairment.  *See* 20 C.F.R. §§ 416.909, 416.920(c), 416.921(a); *see also* 20 C.F.R. § 416.920a(d)(1).

Although Plaintiff has characterized the above argument regarding her mental impairment as a step two issue, it appears that additionally, or more properly, the argument should be considered as a challenge to the ALJ's mental RFC determination, which he decided as part of the step four analysis (Tr. 17, 21–22).  A claimant's RFC describes the most she can do in a work setting despite the physical and mental limitations from her impairments.  20 C.F.R. § 416.945.  Here, the ALJ reviewed and relied on Dr. Loiry's October 2007 mental assessment; he also accepted, as consistent with Dr. Loiry's opinion, the Psychiatric Review Technique and Mental Residual Functional Capacity Assessment completed by the state disability expert and adopted the expert's mental RFC to the extent it was consistent with the finding that Plaintiff could understand, remember, and carry out simple instructions and could concentrate and persist for two hour segments (Tr. 21; Tr. 22; *see also* Tr. 381, Mental Residual Functional Capacity Assessment completed by Judith E. Meyers, Psy.D.).

As the Commissioner argues, Plaintiff has pointed to nothing in the record that demonstrates her mood/anxiety disorder necessitates greater work restrictions than those imposed by the ALJ. The court therefore concludes there is no basis to find error in the ALJ's mental RFC determination.

The court next considers Plaintiff's contention that the ALJ was required, but failed, to consider the medical records of all of her treating physicians. In support of this contention, Plaintiff names Drs. Khan, Dunn, Pappas, and Yassin; she has also cited the medical records of Drs. Hammad, Saleh, Sidani, Langley, and Albibi, as well as Maciej Tumiel, M.D. ("Dr. Tumiel").

Pointing out that the records of Drs. Khan, Dunn, and Pappas predate the alleged disability onset date, the Commissioner apparently contends these records are not relevant to the ALJ's disability determination. While it is true that in some cases records that predate the disability onset date are not relevant to the ALJ's analysis, in other cases such records might be. *See* Carmickle v. Astrue, 533 F.3d 1155, 1165 (9th Cir. 2008) (evidence which predates the alleged period of disability may be of limited relevance); Hamlin v. Barnhart, 365 F.3d 1208, 1223 n.15 (10th Cir. 2004) (evidence that predates the alleged onset date may be relevant to claimant's medical history); DeBoard v. Commissioner of Social Sec., 211 F. App'x 411, 414 (6th Cir. 2006) (evidence predating the onset of disability, when evaluated in combination with later evidence, may help establish disability); Lackey v. Barnhart, 127 F. App'x 455, 458 (10th Cir. 2005) (ALJ should not ignore medical reports simply because they predate the alleged onset of disability). Here, the court agrees with the Commissioner that the records of Dr. Dunn lack relevance to the ALJ's disability determination. According to Plaintiff, Dr. Dunn treated her from December 1997 through at least September 2005 for "gross hematuria, microhematuria, urethral stenosis, pelvic pain, and nephrolithiasis, among other complaints." (Doc. 14 at 3; *see* Tr. 206–19). Plaintiff does not allege or show that she sought treatment for her urinary ailments after April 2007; indeed, on numerous occasions shortly prior to or after that date she specifically denied any such problems (*see* Tr. 312, 356, 398, 404, 406, 410, 413, 415, 420, 423, 425, 428, and 430). Further, Plaintiff does not contend that any urinary complaints keep her from working or contribute to her inability to work. Although the ALJ has a duty to consider a claimant's alleged impairments in combination and to determine whether the combined impairments render the claimant disabled, Jones v. HHS, 941 F.2d 1529, 1533

(11th Cir. 1991), Plaintiff has not alleged disability based on her urinary problems.  Nor has she alleged or shown that this impairment would have any impact on the ALJ's credibility determination. The court thus agrees with the Commissioner that the medical records of Dr. Dunn, which predate Plaintiff's April 2007 disability onset date, are not relevant to the ALJ's disability determination.

The records of Drs. Khan and Pappas arguably do, however, bear on Plaintiff's disability claim.  Although many of Dr. Khan's records are illegible and many of Plaintiff's complaints seem wholly unrelated to her disability claim, it appears his care, at least in part, involved the management of Plaintiff's pain medications for her back impairment and her hypertension throughout most of 2006 (*see* Tr. 295–304).  Also, although Dr. Pappas' care primarily involved treatment and surgery for a breast impairment, as well as removal of a cyst and fatty tumor (*see* Tr. 220–34)—none of which conditions appears to pertain to Plaintiff's disability claim—his records also contain references to neck pain, which Plaintiff testified contributes to her inability to work (Tr. 51).  Thus, to some extent at least, the records of Drs. Khan and Pappas could be relevant to the ALJ's disability determination. The ALJ's decision, however, does not seem to reflect that he considered these medical records.

Nor, apparently, did the ALJ consider the medical records of Drs. Yassin, Hammad, Saleh, Sidani, Langley, Albibi, or Tumiel.  Section 416.927(c) of the Regulations provides that the SSA will evaluate "every medical opinion we receive."[6]  While the ALJ's decision need not specifically refer to every single item of record evidence, Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (citing Foote, 67 F.3d at 1561), the decision nevertheless may not be a broad rejection of the disability claim that is insufficient to enable the court to conclude the ALJ considered the claimant's medical condition as a whole.  *Id.*

The information contained in the records of Drs. Langley, Tumiel, and Albibi shed little or no additional light on Plaintiff's medical condition as a whole.  The symptoms emergency room physician Dr. Langley identified in August 2007 after Plaintiff experienced problems following an

---

[6] This Regulation further provides that in deciding what weight to give the opinion, the SSA will consider the examining relationship, the treatment relationship (including the length of the treatment relationship, the frequency of examinations, and the nature and extent of the treatment relationship), supportability, consistency, specialization, and any other relevant factors.  *See* § 416.927(c) (Plaintiff incorrectly cites this Regulation as § 416.927(b) (*see* Doc. 14 at 10)).

epidural steroid injection (Tr. 346) generally parallel those reported by Dr. Yassin a few days later during a follow-up visit (Tr. 355). Other than giving Plaintiff a small prescription of Percocet to tide her over until she saw Dr. Yassin (who apparently did not offer Plaintiff any additional pain medication), Dr. Langley offered Plaintiff no treatment whatsoever. Dr. Tumiel saw Plaintiff in September 2007 for abdominal pain; the extent of his care was to perform a colonoscopy (Tr. 362–64). Finally, emergency room physician Dr. Albibi merely treated Plaintiff on one occasion—in January 2009—for constipation, shortly after her lumbar surgery (Tr. 471–72). The court therefore concludes that the ALJ's failure to discuss in his decision the medical records of Drs. Langley, Tumiel, and Albibi—which records contain only very limited or duplicative information—provide no basis for granting Plaintiff relief. This failure did not reasonably impact the ALJ's ability to consider Plaintiff's overall medical condition, including viewing her impairments in combination to assess whether the combined impairments were disabling.

     Plaintiff's extensive medical history (which includes records from Drs. Yassin, Hammad, Saleh, Sidani, Langley, Albibi, Tumiel, Shores, Vu, Merle Stringer, Douglas Stringer, Loiry, and others) reflects that she has reported and been evaluated for numerous mental and physical complaints. In addition to degenerative disc disease of the lumbar spine and anxiety, these complaints include, among others, cervical spine problems, diverticulitis, a broken foot, restless leg syndrome, hypertension, gastroesophageal reflux disease, occipital neuralgia, sleep apnea, bronchitis, obesity, and asthma. At step two, the ALJ addressed Plaintiff's restless leg syndrome, sleep apnea, bronchitis, obesity, and asthma, finding these conditions to be non-severe due to a lack of objective evidence or only minimal problems associated with them (Tr. 15). The ALJ also addressed Plaintiff's hypertension, not at step two but in connection with his RFC determination at step four (Tr. 21). The ALJ failed completely, however, to mention Plaintiff's cervical spine problems, diverticulitis, gastroesophageal reflux disease, occipital neuralgia/headaches, or broken foot, reference to which conditions may be found in the records of Drs. Yassin, Hammad, Saleh, and Sidani. Based on this failure to discuss any of the documentation of these medical problems, as well as the apparent failure to address the records of Drs. Khan and Pappas, the court is unable to conclude the ALJ adequately considered Plaintiff's medical condition as a whole. Additionally, as the ALJ himself noted, in

making his physical RFC finding, he was required to consider all of Plaintiff's impairments, including impairments that are non-severe (Tr. 14, citing 20 C.F.R. §§416.920(e) and 416.945; SSR 96-8p). Thus, even if some of the impairments which the ALJ failed to discuss are properly considered non-severe at step two, he nevertheless was required to consider them in assessing Plaintiff's RFC. The court finds no clear indication in his decision that the ALJ did so. Moreover, given the lack of discussion of a significant portion of the medical record in the ALJ's decision,[7] the court cannot conclude that the ALJ properly considered Plaintiff's alleged impairments in combination so as to assess whether the combined impairments could result in Plaintiff's disability. Jones, 941 F.2d at 1533. Remand is therefore warranted for the ALJ to consider, to the extent appropriate, the relevant medical opinions of Drs. Khan, Pappas, Yassin, Hammad, Saleh, and Sidani, and to render an opinion considering these opinions that is easily susceptible to judicial review. The ALJ should consider all of Plaintiff's credible alleged impairments in reaching his RFC determination and consider all of these impairments in combination. Additionally, the ALJ shall have the opportunity to revisit his assessment of Plaintiff's credibility in light of all of the relevant evidence and, to the extent he relies on Plaintiff's failure to comply with recommended medical care, to consider Plaintiff's claim of poverty. *See* Ellison v. Barnhart, 355 F.3d 1272, 1275 (11th Cir. 2003) (before denying application based on the failure to comply with prescribed medical care, ALJ must consider whether claimant is able to afford the medical care; if the failure to follow medical treatment is not one of the principal factors in the ALJ's decision, however, the ALJ's failure to consider the ability to pay does not constitute reversible error).

VIII. CONCLUSION

For the foregoing reasons, the undersigned concludes that the Commissioner's decision is not supported by substantial evidence and should not be affirmed. *See* 42 U.S.C. § 405(g); Foote, 67 F.3d at 1556 (remanding for additional administrative proceedings). Rather, this case should be reversed and remanded for further proceedings consistent with this Report and Recommendation.

---

[7] It appears that the ALJ's decision fails to clearly identify approximately 115 pages of the 292 pages of medical records in Plaintiff's 498-page administrative file (*see* Tr. 206–322).

Case No.: 5:11cv184/RH/EMT

Accordingly, it is respectfully **RECOMMENDED**, pursuant to sentence four of 42 U.S.C. § 405(g), that the decision of the Commissioner be **REVERSED**, that the Commissioner be ordered to remand this case to the ALJ for further proceedings consistent with this Report and Recommendation, and that the clerk be directed to close the file.

At Pensacola, Florida this  23rd  day of July 2012.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


### NOTICE TO THE PARTIES

Any objections to these proposed recommendations must be filed within fourteen (14) days after being served a copy hereof.  **Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.**  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* **28 U.S.C. § 636;** United States v. Roberts**, 858 F.2d 698, 701 (11th Cir. 1988).**